# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION

CHRISTINA TURNER, on behalf of herself, and all others similarly situated,

        Plaintiff,

              v.

PILLPACK, INC.

        Defendant.

Case No.: Case No.: 5:18-cv-66-TBR

## PLAINTIFF'S OPPOSITION TO DEFNDANT'S MOTION TO COMPEL ARBITRATION

**On the Brief:**

**LAW OFFICES OF RONALD A. MARRON**
ALEXIS M. WOOD (CA Bar 270200) (*Pro Hac Vice*)
KAS L. GALLUCCI (CA Bar No. 288709) (*Pro Hac Vice*)
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

***Attorneys for Plaintiff and the Proposed Clas***

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

   A.   Plaintiff's Receives Unsolicited Text Messages from PillPack and Files Suit.................. 2

   B.   Fluent LLC's Representations of Ms. Turner's Alleged Interactions with Fluent and other Entities....................................................................................................................... 3

   C.   Other Litigation Against Against Fluent's Clients and Similar Type Litigation................. 8

ARGUMENT .............................................................................................................. 12

   A.   The Federal Arbitration Act Does Not Require A Party To Arbitrate Unless The Party Has Agreed To Do So......................................................................................................... 12

   B.   Plaintiff Never Entered Into Any Agreement Whatsoever, Much Less An Arbitration Agreement with PillPack............................................................................................... 13

      1.   Plaintiff Denies She Visited the RewardZone USA Website Where the Alleged Agreement to Arbitrate Was Posted. ................................................................... 14

      2.   Plaintiff Never Agreed to an Arbitration Clause and Even if She Did (She Did Not) The Arbitration Clause Is With RewardZone Not PillPack.......................................... 15

   C.   PillPack's Reliance on Caselaw is Misguided. ............................................................ 18

   D.   Plaintiff's TCPA Claim is Outside the Scope of RewardZone USA's Terms and Conditions. ................................................................................................................ 20

   E.   PillPack, an Unrelated Non-signatory, Cannot Enforce RewardZone's Agreement. ........ 22

   F.   PillPack Cannot Compel Arbitration as Third-Party Beneficiary...................................... 24

CONCLUSION........................................................................................................... 25

# **TABLE OF AUTHORITIES**

## Cases

*Am. Bankers Ins. Grp., Inc. v. Long*,
  453 F.3d 623 (4th Cir. 2006) ................................................................... 22

*Arnold v. Homeaway, Inc.*,
  890 F.3d 546 (5th Cir. 2018) ................................................................... 19

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ..................................................................... 13, 22

*AT & T Techs. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ............................................................................ 13

*Berman v. Freedom Financial Network, LLC*,
  No. 18-cv-01060-DMT, 2018 WL 2865561 (N.D. Cal. June 11, 2018) ............................ 9, 20

*Burke & Thomas, Inc. v. Int'l Org. of Masters*,
  600 P.2d 1282 (1979) .......................................................................... 24

*Carey v. Uber Techs., Inc.*,
  No. 1:16-CV-1058, 2017 WL 11339362 (N.D. Ohio Mar. 27, 2017) .................................. 19

*Conseco Finance Servicing Corp. v. Wilder*,
  47 S.W.3d 335 (Ky. App. 2001) ................................................................. 14

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002) ............................................................................ 20

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  130 S. Ct. 2847 (2010) .......................................................................... 12

*Gray v. Midland Funding, LLC*,
  No. 5:16-CV-00036-TBR, 2017 WL 1293995 (W.D. Ky. Apr. 4, 2017) .............................. 20

*Hoffman v. Deloitte & Touche LLP*,
  143 F.Supp.2d 995 (N.D. Ill. 2001) .......................................................... 22

*Homestake Lead Co. of Mo. V. Doe Run Res. Corp.*,
  282 F.Supp.2d 1131 (N.D. Cal. 2003) ......................................................... 12

*Household Finance Corp. II v. King*,
  No. 2009-CA-001472-MR, 2010 WL 3928070 (Ky. App. October 8, 2010) ......................... 22

*Javitch v. First Union Sec., Inc.*,
  315 F.3d 619 (6th Cir. 2003) ................................................................. 12

*Jennings Water, Inc. v. North Vernon,*
   895 F.2d 311 (7th Cir. 1989)............................................................... 22

*L.K. Comstock & Co., Inc. v. Becon Construction Co.,*
   932 F. Supp. 948 (E.D. Ken. 1994)..................................................... 21

*Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.,*

   420 F.Supp.2d 764 (W.D. Ky. 2005) ................................................... 24

*McKee v. Audible, Inc.,*
   No. CV 17-1941-GW(EX), 2017 WL 4685039 (C.D. Cal. July 17, 2017) ............................. 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985) ............................................................................. 21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983) ................................................................................. 12

*MS Dealer Serv. Corp. v. Franklin,*
   177 F.3d 942 (11th Cir.1999)............................................................... 22

*Noohi v. Toll Bros., Inc.,*
   708 F.3d 599 (4th Cir. 2013)............................................................... 18

*Perry v. Thomas,*
   482 U.S. 483 (1987) ............................................................................. 13

*PNI, Inc v. Leyton,*
   No. CIV. 03-1344-MO, 2004 WL 555249 (D. Or. Mar. 1, 2004) ....................... 12

*Presnell Constr. Managers, Inc. v. EH Const., LLC,*
   134 S.W.3d 575 (Ky. 2004) ................................................................. 24

*Rajagopalan v. NoteWorld, LLC,*
   718 F.3d 844 (9th Cir. 2013)............................................................... 23

*Richmond Health Facilities v. Nichols,*
   811 F.3d 192 (6th Cir. 2016)............................................................... 13

*Schnuerle v. Insight Commc'ns Co., L.P.,*

   376 S.W.3d 561 (Ky. 2012) ................................................................. 14

*Seawright v. Am. Gen. Fin. Servs., Inc.,*
   507 F.3d 967 (6th Cir. 2007)............................................................... 13

*Seim v. HomeAway, Inc.,*
   No. 1:16-CV-479-LY, 2017 WL 3478488 (W.D. Tex. Jan. 18, 2017) .................... 19

*Sexton v. Taylor County,*
    692 S.W.2d 808 (Ky. Ct. App. 1985)....................................................... 24

*Stout v. J.D. Byrider,*
    228 F.3d 709 (6th Cir. 2000)............................................................... 13

*Tres Jeanee, Inc. v. Brolin Retail Sys. Midwest, Inc.,*
    No. CIV. A. 3:07-CV-139H, 2007 WL 3118482 (W.D. Ky. Oct. 22, 2007).......................... 19

*United Steelworkers of Am. V. Warrior & Gulf Navigation Co.,*
    363 U.S. 574 (1960) ...................................................................... 12

*W.E. Erickson Const., Inc. v. Chicago Title Ins. Co.,*
    641 N.E.2d 861 (Ill. App. 1st Dist. 1994) ............................................... 18

*White v. Sunoco, Inc.,*
    870 F.3d 257 (3d Cir. 2017) .............................................................. 23

**Statutes**

9 U.S.C. §4.................................................................................... 12

**Other Authorities**

*In Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27
    F.C.C. Rcd. 1830, 1844 (FCC Feb. 15, 2012)............................................... 2

## INTRODUCTION

Defendant PillPack, Inc. "("Defendant" or "PillPack") moves to compel arbitration of Ms. Turner's individual TCPA claims despite PillPack not being a signatory to the alleged arbitration agreement and despite Ms. Turner having no prior relations with PillPack.  PillPack cannot force Ms. Turner to waive her right to trial by jury and represent a class unless it proves the existence of a valid, enforceable agreement to arbitration and that it may invoke the agreement without being a party to the alleged contract.

PillPack contends, based on representations by Fluent, LLC, that Ms. Turner visited www.consumersrvycnter.com, a website owned and operated by RewardZone USA, LLC, on June 6, 2016.  Once on the RewardZone USA website, Ms. Turner allegedly agreed to hyperlinked Terms & Conditions which contained an arbitration clause. Ms. Turner never received any consideration for the contract and thus would have essentially agreed to waive her right to jury trial for nothing in return.   Over a year later, on October 25, 2017, Ms. Turner allegedly visited a completely different website www.consumerproductsusa.com, purportedly owned and operated by RewardZone USA, LLC and provided certain demographic information.  It is this alleged October 25, 2017 website visit to which Ms. Turner purportedly provided her information to "Verde Energy, CAC and our Marketing Partners" and allegedly provided prior express written consent[1] to be contacted by PillPack, who was referenced via a non-descript hyperlink containing hundreds, if not thousands, of completely unrelated "Marketing Partners."  PillPack, who retained Fluent, LLC to solicit business, now attempts to utilize the alleged Plaintiff-RewardZone USA, LLC arbitration agreement to force Ms. Turner to arbitrate her claims against PillPack and

---

[1] While this motion focuses on arbitration, Plaintiff denies that she ever provided prior express written consent as required by the TCPA.

essentially thwart her ability to achieve relief for others who were harassed by PillPack.

## BACKGROUND

### A. Plaintiff's Receives Unsolicited Text Messages from PillPack and Files Suit.

Ms. Turner placed her cellphone number on the National Do Not Call Registry on January 25, 2006.  *See* Declaration of Christina Turner ("Turner Decl.") at ¶ 1.  Ms. Turner has never removed her cellphone number from the National Do Not Call Registry.  *Id.*  at ¶ 2.  Importantly, whether on the National Do Not Call Registry or not, a company may not solicit its business through automated telemarketing calls or text messages unless it acquires the prior express written consent of the individual to whom the call or text message is made.  *In Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 ¶ 33 (FCC Feb. 15, 2012).

Ms. Turner has never done business with PillPack or given PillPack permission to call her.  *See* Turner Decl., at ¶ 3.  Similarly, Ms. Turner has never done business with Fluent, LLC or given Fluent, LLC permission to call her.  *See* Turner Decl., at ¶ 4.  However, although Ms. Turner had never heard of these entities, on October 26, 2017, she received the following unsolicited SMS telemarketing text message to her private cellular telephone number, "Christina get your mediation, packaged by the dose and shipped directly to your door for Free, every month.  When can you talk to learn more?"  *See* Turner Decl., at ¶ 5.

As Ms. Turner did not recognize the number from which the SMS text messages was sent, 774-500-1072, and had no previous business dealing or relationships with any entities offering prescription mail services, Ms. Turner responded to the SMS text message with "Who is this?"  *See* Turner Decl., at ¶ 6.  Ms. Turner subsequently received a second SMS text message stating, "This is PillPack.  We're here to help you save time by delivering your medication straight to your

2

door.  What's a good time to talk?"  *See* Turner Decl., at ¶ 7.  Annoyed and feeling harassed, Ms. Turner responded "Never."  *See* Turner Decl., at ¶ 8.

On May 8, 2018, Plaintiff filed a putative class action complaint alleging negligent and willful violations of the TCPA, 47 U.S.C. § 227, on behalf of herself and all others similarly situated. Dkt. No. 1. Thereafter, on July 7, 2018, PillPack filed an Answer to Plaintiff's Complaint. Dkt. No. 16.  Notably absent from PillPack's Answer is any affirmative defense raising arbitration as to the Plaintiff.[2]  *See* Dkt. No. 16 at p. 12-15.  To date, Plaintiff has served substantial discovery on PillPack, however PillPack has provided limited responses as PillPack claims that most of the discovery Plaintiff seeks is in the possession of Fluent, LLC.  *See* Gallucci Decl. at ¶ 2. In an attempt to gather necessary documents and information, Plaintiff served a subpoena on Fluent, LLC; however, did not receive any information in response.  *Id.* at ¶ 3.  Realizing that Fluent, LLC is a necessary party to the case, as PillPack hired Fluent, LLC to send the unsolicited text messages (which Plaintiff has now learned were actually sent by another unnamed third party), Plaintiff timely filed a Motion for Leave to Amend her Complaint on January 14, 2019. *See* Dkt. No. 28. Only now, nearly seventh months after PillPack filed an Answer and engaged in discovery, has PillPack filed a Motion to Compel Arbitration and to Stay Plaintiff's case.  Dkt. No. 34.

### B. Fluent LLC's Representations of Ms. Turner's Alleged Interactions with Fluent and other Entities.

PillPack and Fluent oversimplify facts in order to provide a skewed view of the alleged relationship and transactions between Ms. Turner and RewardZone USA.  According to Fluent LLC's declarant Mitenkumar Bhadania, "[Christina Turner] landed on www.consumersrvycnter.com, a website owned and operated by RewardZone USA LLC, a wholly

---

[2] PillPack's Seventh Affirmative Defense, in a string of unspecific affirmative defenses mentions arbitration, but the Seventh Affirmative Defense is specific "to absent putative class members" and does not include the Plaintiff.  *See* Dkt. No. 16 at p. 13.

owned Fluent subsidiary ("RZU")" on June 6, 2016.  Dkt. No. 34-4 at ¶ 6.  In support of this statement, Fluent, LLC shows a partial HTML[3] that Plaintiff allegedly viewed.  *Id.* at ¶ 7. Unexplainably, this image is significantly different than the image Mr. Bhadania previously identified on December 17, 2018 which lacks the "get a Michael Kors Designer Bag, $500*" banner at the top and the National Consumer Center banner at the bottom. *See* Dkt. No. 33-1 (Mitenkumar Bhadania Declaration dated December 17, 2018 at ¶ 7).  In either instance, Ms. Turner denies she ever typed www.consumersrvycnter.com into any web browser, denies ever entering a promotion or sweepstake to win a Michael Kors bag, and affirmatively states that she has never received a Michael Kors bag from Fluent LLC, RewardZone USA or National Consumer Center. *See* Turner Decl., at ¶¶ 9-11.[4]

Fluent, LLC, in a poor attempt to support its position that Ms. Turner did visit www.consumersrvycnter.com and allegedly agreed to certain Terms and Conditions, produces information that a "User" allegedly "clicked the Continue button on June 6, 2016 at 2:48:40 AM, ET" Dkt. No. 34-4 at ¶ 9.  Fluent, LLC's declaration does not provide any other information or

---

[3] Fluent, LLC failed to provide the actual URL (webpage) or all of the web screens Plaintiff allegedly would have seen to arrive at this final screen.

[4] It is Plaintiff's position that the websites cited by Fluent are scam rewards cites which would have never yielded a prize. In support, in order to combat the intrusive nature of these specific websites, numerous adware-type virus detection companies have released step by step solutions to remove the malware stemmed from scams.  *See* National Consumer Center ads. How to remove? (Uninstall guide), by Jake Doevan, available at https://www.2-spyware.com/remove-national-consumer-center-ads.html (last visited February 28, 2019) ("National Consumer Center scam is a misleading pop-up window trying to trick user into believing that a non-existent organization is willing to give them a free iPhone or similar prize….Typically, they interrupt people while they are browsing on the web and ask them to fill surveys to win expressive prizes. However, in exchange for an iPhone or Samsung Galaxy smartphone, participants are usually asked to provide their personal information, such as email address, phone number or even credit card information."); *see* Consumerproductsusa Amazon Gift Card Scam Removal (Feb. 2019 Update), available at https://howtoremove.guide/consumerproductsusa-amazon-gift-card-scam/ (last visited on February 28, 2019).

meta-data such as the user's IP address, browser type, operating system, or for mobile connected devices, the device model, device ID and mobile carrier.[5]

Imbedded within the HTML image produced by Fluent, LCC is a non-discrete hyperlink which allegedly directs the User to a document entitled "RewardZoneUSA, LLC Websites -Terms and Conditions" (last modified December 16, 2015).  The document states "We (RewardZone USA, LLC) operate RewardZoneUSA.com, NationalConsumerCenter.com and other Websites (Websites) where you can qualify to earn incentives – merchandise or gift cards (Incentives) – by completing certain offers Promotions."  Notably missing from the "We" is Fluent, LLC or any "Marketing Partners" (discussed in more detail below).  Further, it is important to note that "other Websites" is defined as "Websites" (plural) which is in stark contrast to the "Arbitration/Dispute Resolution" section of the Terms and Conditions, where it states a "dispute" purportedly covered by the clause is limited to "the Website" (reasonably only understood as "the Website" from which a user is redirected, www.consumersrvycnter.com) and no other website or websites.

The "Arbitration/Dispute Resolution" clause in the Terms and Conditions, provides as follows:

> If you have a ***dispute concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive***, you should first contact customer support on our Website or by completely a customer support ticket.  We will attempt to resolve the matter to your satisfaction within thirty (30) days of our receipt of a customer support ticket. We may choose to provide you with a final written settlement offer during this process.  If we provide you with a final written settlement offer and you don't accept it, or we can't otherwise satisfactorily resolve your dispute or you chose to skip this step, ***you can*** submit your dispute for resolution by arbitration before the American Arbitration Association ("AAA") in the county where you live by filing a

---

[5] This is important since Fluent's 10-K admits its "technology platforms and systems enable [them] to collect …. *Meta-data* – information gleaned by the system such as the user's IP address, browser type, operating system, and, for mobile connected devices, the device model, device ID and mobile carrier."  *See* Cogint, Inc. 10-K at p. 4, available at http://investors.fluentco.com/static-files/7dfdc04f-94ec-4f49-9b27-32a91b8c162f  (last visited on February 27, 2019).

separate Demand for Arbitration online by following the instructions at https://apps
.adr.org/webfile/. You will need our mailing address to file online which is RewardZone
USA, LLC, 128 Court Street, 3rd Floor, White Plains, NY 10601; Fax: 646-607-1910.
*See* Dkt. No. 34-4 at Exhibit A (emphasis added).

The Arbitration/Dispute Resolution clause in the Terms and Conditions then continues

with other conflicting and ambiguous language in a different paragraph and am different page:

> You agree to the entry of injunctive relief to stop such a lawsuit or to remove you as a
> participant in such a suit.  The Terms & Conditions do not constitute a waiver or any of
> your rights and remedies to pursue a claim individually and not as a class action in binding
> arbitration as provided above.  This provision preventing you from bring, joining or
> participating in class action lawsuits is an independent agreement. You may opt-out of
> these Dispute Resolution Provisions by providing written notice of your decision within
> thirty (30) days of the date that you first registered on our Website.
> **YOU ACKNOWLEDGE AND AGREE THAT, VIA YOUR ACCPETANCE OF**
> **THESE DISPUTE REOLSUTION PROVISIONS, YOU WAIVE ANY RIGHT TO**
> **A JURY TRIAL, AS WELL AS YOUR RIGHT TO BRING, JOIN OR**
> **PARTICPATE AS A PLAINTIFF OR CLASS MEMBER IN A CLASS ACTION**
> **SUIT OR MULTI-PARTY ARBITRATION BROUGHT AGAINST US, ANY**
> **PERSON RELATED TO US OR A SERVICE PROVIDER USED BY US TO**
> **PROVIDE THE SERVICE.**

*Id.* (emphasis in original).

It is important to note that at the time Ms. Turner allegedly agreed to RewardZone USA's

Terms and Conditions, **PillPack was not a customer of RewardZone USA**, nor was PillPack a

customer of Fluent, LLC or Fluent, Inc.   *See* Dkt. No. 34-3. As to PillPack's contractual

relationship with Fluent, LLC, it began on October 17, 2017, over 16 months after Plaintiff

allegedly agreed to arbitration with RewardZone USA.  *See* Dkt. No. 34-2 at p. 5.  PillPack never

had an agreement (or at least has failed to produce any agreements despite discovery requests)

with RewardZone USA, LLC or Fluent, Inc.

PillPack admits that despite Ms. Turner allegedly assenting to an arbitration clause on June

6, 2016, that it was not until Ms. Turner's alleged interactions on a different website over sixteen

(16) months later, which prompted the text messages at issue in this case.  Fluent, LLC claims that

on October 25, 2017, "[Plaintiff] visited http://consumerproductsusa.com, also a rewards website owned and operated by [RewardZone USA]." *See* Dkt. No. 34-4 at ¶ 11.   Fluent claims because Ms. Turner was already a registered user (on the www.consumersrvycnter.com website) RewardZoneUSA did not present a registration page to Plaintiff which would have required Ms. Turner to assent to RewardZoneUSA's terms and conditions, including the agreement to arbitrate. *See id.*  Fluent, LLC's declarant then provides five HTML screen (not webpages) and claims that Ms. Turner responded to a survey and then provided certain demographic information.  *See* Dkt. No. 34-4 at ¶¶ 11-12.  But the declaration is devoid of any proof that Ms. Turner actually provided that information as no screen actually shows where she would have provided said information, and instead only provides a "regenerated HTML".  *See id.*

This "regenerated HTML" allegedly shows in tiny font that Ms. Turner consented to receive phone calls from "Verde Energy, CAC and our Marketing Partners."   While Marketing Partners appears to be hyperlinked to large list of "Marketing Partners," PillPack has admitted that is has no relationship with Verde Energy CAC.  *See* Dkt. No. 28-3 at p. 40 of 41 (Def.'s Resp. to Inerrog. No. 13 "PillPack states its have never had a relationship with Verde Energy CAC.") Moreover, a reasonable reading of the sentence has "our Marketing Partners" modifying Verde Energy, and not RewardZone USA's "Marketing Partners" or Fluent, LLC's clients like PillPack. Such an attenuated stretch certainly defeats any "clear and conspicuous" consent disclosure as completed by the TCPA. [6]  *See also* Gallucci Decl., Exhibit 1 (Supplemental Expert Report of

---

[6] Prior express written consent means:

> an agreement, in writing, bearing the signature of the person called that **clearly authorizes** the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or marketing messages to be delivered.

Benjamin H. Beecher filed in a related TCPA case against Fluent, Inc. at ¶¶ 12-31).

In order to tie Plaintiff to the alleged two website visits, Fluent, LLC claims that on June 6, 2016 its "System recorded that Plaintiff was using the IP address 67.172.100.191" (Dkt. No. 34-3 at ¶16) and that same IP Address was captured on the alleged October 25, 2017 visit (Dkt. No. 34-4 at ¶ 11).  Unexplained by Fluent or PillPack is that Plaintiff's address changed from 2954 Clay Street to 526 Glenwood Drive, which would have yielded a different IP Address.[7]

## C.  Other Litigation Against Against Fluent's Clients and Similar Type Litigation.

Ms. Turner's complaint is not the first TCPA case filed against one of Fluent's clients.  On February 19, 2018, a TCPA class action complaint was filed against two of Fluent's clients – Freedom Financial Network LLC and Freedom Debt Relief LLC.  *See* Gallucci Decl. at Exhibit 2 (Docket Sheet for *Berman v. Freedom Financial Network, LLC*, No. 4:18-cv-01060-YGR (N.D.

---

47 C.F.R. § 64.1200(f)(8). To be effective, such consent also must satisfy further requirements:

> (i) The written agreement shall include a **clear and conspicuous** disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property goods, or services.

*Sullivan v. All Web Leads, Inc*., No. 17 C 1307, 2017 WL 2378079, at *2–3 (N.D. Ill. June 1, 2017).

[7] *See IP101: The Basics of IP Address*, available at https://whatismyipaddress.com/ip-basics (last visited on February 28, 2019) (containing a detailed description of IP addresses and noting that "[W]here you're at home, an IP address is assigned to your computer by your Internet service provider… Since they are the ones giving you access to the Internet, it's their role to assign an IP address to your computer. Your internet activity goes through them, and they route it back to you using your IP address.  But don't get attached to it… because it's not really yours.  Even at home it can change if your do something as simple as turn your modem or router on and of…. So, when you're at a coffee shop in another city or state (or just down the road) and you're using their WiFi to get your email, you're using a different (and temporary) IP address…). *Compare* Gallucci Decl., Exhibit 1 (Beecher Decl. at ¶ 40) and Dkt. No. 34-4 (showing missing data under "ParamXML" column which would have included additional source data).

Cal.), Dkt. No. 1).  Like Ms. Turner's case against PillPack, Mr. Berman received an unsolicited text message out of the blue from an unknown number advertising debt relief help.  *See* Gallucci Decl. at Exhibit 3 at p. 5. Also, like the present case, the defendant's filed a motion to compel arbitration advancing the same arguments as PillPack and providing the same self-serving and factually devoid declarations of Mitenkumar Bhadania and Daniel Barsky as in this case.  *See* Gallucci Decl. at Exhibits 4 & 5.  Notably, the *Berman* court denied the defendants' motion to compel arbitration and to stay the case.  *See Berman v. Freedom Financial Network, LLC*, No. 18-cv-01060-DMT, 2018 WL 2865561 (N.D. Cal. June 11, 2018). In denying the motion to compel arbitration, the court found defendant "failed to show the absence of a genuine issue of fact regarding whether Berman agreed to the terms and conditions, including the arbitration provision," and further denied that equitable estoppel applied to a situation "where there are disputed facts about whether the parties actually formed an agreement to arbitrate." *Id.* at *4-5.

Thereafter, on June 14, 2018, Mr. Berman filed a first amended complaint naming Fluent, Inc. and Lead Science, LLC and included allegations that "Fluent runs sweepstakes websites in order to collect contact information of consumers whom it subsequently barrages with SMS and other advertising[,]" and that "Lead Science runs SMS telemarketing campaigns for lead generators, such as Fluent." *See* Gallucci Decl. at Exhibit 6 (*Berman* FAC at ¶¶ 39 & 48).  Notably, in Fluent's answer it admitted "it runs certain sweepstakes websites" and admitted "that Fluent and Lead Science entered into a contractual relationship, a document which speaks for itself." *See* Gallucci Decl. at Exhibit 7 (*Berman* Dkt. No. 46 at ¶¶ 39 & 48).  Lead Science similarly responded. *See* Gallucci Decl. at Exhibit 8 (*Berman* Dkt. No. 47 at ¶ 48).  On October 30, 2018, Mr. Berman filed a second amended complaint (*Berman* Dkt. No. 90) and on February 8, 2019, Mr. Berman filed his motion for class certification. *See* Gallucci Decl. at Exhibit 2 (*Berman* Dkt. No. 139-144).

Mr. Berman's motion for class certification, filed after he was afforded the ability to conduct substantial discovery from the defendants, including Fluent, sheds light on the defendants' harassing telemarketing campaigns. *See* Gallucci Decl. at Exhibit 9 (*Berman* Dkt. No. 139). Notably, and with citations to evidence, the defendants made 4,492,433 telemarketing calls to the plaintiff and others who were registered on the National Do Not Call Registry (*id.* at p. 1:16-20), and continued placing calls despite "receiv[ing] over 200,000 do-not-call requests, ***including over 5,000 complaints alerting them that the recipient was not the person Defendants purported to be trying to reach.***" *Id.* at 1:20-2:2 (emphasis in original). Mr. Berman also dedicated time in discussing "Fluent's disclosures when obtaining phone numbers are deceptive and manipulative." *Id*. at 6:8-7:10. Specifically, Mr. Berman describes

> "It's understandable that Defendants have been reluctant to produce the websites at the root of these do-not-call requests and wrong-number complaints. (See, e.g., Dkt. No. 90-4 ¶ 162 (fraudulent website promoting Fluent, identified outside of discovery).) In fact, Fluent has refused to produce full screenshots even for the site allegedly visited by "Dunk Loka," the name in the lead relied upon by Defendants when spamming Plaintiff. (Dkt. No. 16-1 at 5 (reproducing just a fraction of the list of marketers from which Mr. or Mrs. Loka purportedly consented to receive telemarketing); see also Dkt. No. 94-2 at 8 (same, for different consumer).) Other litigation has revealed that Fluent is, out of all the vendors to a major lead buyer, the lone holdout that still insists that the buyer keep the URLs from which Fluent's "leads" are generated a secret. Def. Royal Seas Cruises, Inc.'s Mem. P&A Opp'n Pl.'s Mot. Class Certification at PageID 1371:17-1373:11, 1458 ¶ 13 & n.2, McCurley v. Royal Seas Cruises, Inc., Case No. 3:17-cv-00986-BAS-AGS (S.D. Cal. Oct. 22, 2018), ECF No. 58."

*Id.* Mr. Berman continues,

> "[d]espite this obfuscation, what is clear from Fluent's sworn statements is that the manner in which it obtains phone numbers to robocall is uniformly non-compliant with the TCPA and the Electronic Signatures in Global and National Commerce Act ("E-SIGN Act"), 15 U.S.C. §§ 7001 et seq. Fluent insists that its websites uniformly and commonly procured "TCPA Consent" (Fluent's phrase) for all class members. (Dkt. No. 94-2 ¶¶ 9-18; Dkt. No. 104 at 17-19.) But uniformity and commonality do not equal validity. Plaintiff will show at trial that Fluent's disclosures were both inconspicuous and misleading, vitiating the

> "consent" procured even from those real consumers (if any) who visited Fluent's sites.
> Fluent's multi-step disclosure process is confusing (See Dkt. No. 120-7 at 4-5.) and its list
> of "marketing partners" on yet another page runs over 400 names long. (Fougner Decl. ¶
> 11 & Ex. B at FLUENT_388-392.) Moreover, the jury will see that Defendants have neither
> produced a single actual signature of any class member nor complied with the TCPA's
> requirements as to the disclosures that are required by the E-SIGN Act to be made to
> consumers in the absence of actual signatures."

*Id.* at 6:22-7:10.  Plaintiff Turner expects the discovery in her case will reveal the same results.

Moreover, Mr. Berman introduced the expert opinion of Benjamin H. Beecher, the co-founder, CTO and board member of Lightmatter Innovation.  *See* Gallucci Decl., Exhibit 1 (Supplemental Expert Report of Benjamin H. Beecher filed in a related TCPA case against Fluent, Inc.).  Mr. Beecher offered opinions on "accepted best practices in the website design and development industry when expecting a user to content to terms before submitting the user's information on an interactive website form[,] … examine the technology infrastructure used by the Defendants, … to assess the validity of the data captured by Fluent's System, and whether that data supports Defendants' assertion that individual, unique users input data into website forms allegedly consenting to receiving telemarketing solicitations, …the types and extent of information produced and withheld to date bearing those issues, and … the experience of users who purportedly consent to receive telemarking calls via Fluent's website and whether the disclosures contained in those websites, and the manner in which those disclosures were presented to the end user, were clear and conspicuous or misleading, confusing, and unfair." *Id.* at ¶ 9.  Mr. Beecher reached the following conclusions which is supported in his declaration with detailed explanations about how he arrived at those conclusions:

> (A) An analysis of the System from which Defendants purportedly obtained consumers'
> prior express signed consent to receive telemarketing calls reveals that the relevant
> disclosures were manipulative, confusing, and unfair and not clear and conspicuous. In my
> opinion, these disclosures fell far below industry standards and best practices in consumer

11

web design.

(B) Many of Fluent's leads were driven by computer-generated bots (or inserted directly into the database) rather than real people submitting a form on the website. The purportedly real submissions (i) did not have to pass Captchas or HTTPS; (ii) would have created relevant data that Fluent has failed to produce; (iii) include machine-written leads and those with no evidence of consent at all; (iv) reflect implausibly high conversion rates; (v) triggered an extraordinary complaint rate; and (vi) if valid, would have been supported by the server logs that Fluent has destroyed."

*Id.* at ¶ 10; *see also* ¶¶ 11-55.  Ms. Turner expects the discovery will reveal similar conclusions.

## ARGUMENT

### A. The Federal Arbitration Act Does Not Require A Party To Arbitrate Unless The Party Has Agreed To Do So.

The FAA provides "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. §4. "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003).

Federal cases consistently hold that the FAA embodies a clear federal policy in favor of arbitration. *See PNI, Inc v. Leyton,* No. CIV. 03-1344-MO, 2004 WL 555249, at *2 (D. Or. Mar. 1, 2004) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22–23 (1983)). However, a court may deny arbitration when it may be said with "positive assurance" that the arbitration clause does not govern the claims at issue. *See United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960). The Supreme Court has emphasized "the first principle that underscores all of our arbitration decisions: Arbitration is strictly a matter of consent, and thus is a way to resolve only those disputes — but only those disputes — that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 (2010)

12

(citations omitted); *see also Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *AT & T Techs. v. Commc'ns Workers of Am*., 475 U.S. 643, 648 (1986)). ("[A]rbitration is a 'matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'")

When a party invokes the FAA and asks a federal court to dismiss or stay a case and compel arbitration, the Court must determine whether the parties agreed to arbitrate the dispute at issue. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). Courts should engage in the following four-step inquiry: (1) determine whether the parties agreed to arbitrate; (2) determine the scope of that agreement; (3) if federal statutory claims are asserted, the Court must consider whether Congress intended those claims to be non-arbitrable; and (4), if the Court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration. *Id*.

## B. Plaintiff Never Entered Into Any Agreement Whatsoever, Much Less An Arbitration Agreement with PillPack.

Arbitration agreements are fundamentally contracts. As such, courts must "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.,* 507 F.3d 967, 972 (6th Cir. 2007); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) ("[S]tate law," therefore, is applicable to determine which contracts are binding under § 2 and enforceable under § 3 "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.") (quoting *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987)).

The Supreme Court of Kentucky has held that:

[p]rocedural, or "unfair surprise," unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language.... [It] involves, for example, 'material, risk-shifting' contractual terms which are not typically expected by the party who is being asked to

'assent' to them and often appear [ ] in the boilerplate of a printed form."
*Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 576 (Ky. 2012) (quoting *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 343 n. 22 (Ky. App. 2001) (internal citations omitted)). Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, "the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.*

Even in this Internet Age with the rise of online "terms and conditions," the fundamental rules of paper contracting still govern transactions between corporations and consumers. To exist, online agreements require mutual assent, a meeting of the minds, and definiteness as to the agreed upon terms. To be enforced, online agreements cannot be unconscionable and consent cannot be compelled by duress. Posting proposed terms and a waiver of an ability to litigation by jury trial online may be convenient and inexpensive for corporations, but doing so does not dispose of the requirements for forming binding agreements with consumers.   When the terms of a proposed online agreement are obscured by the manner in which they are presented, there is a real risk that consumers will have a false belief that few, if any, burdens are associated with their online activities and transactions. Here, PillPack simply cannot meet its initial, affirmative burden to show that Ms. Turner agreed to arbitrate her claims and knowingly and voluntarily waived her constitutional right to a jury trial and other important rights.

1. **Plaintiff Denies She Visited the RewardZone USA Website Where the Alleged Agreement to Arbitrate Was Posted.**

PillPack cannot carry its burden because Plaintiff never visited the RewardZone USA's website www.consumersrvycnter.com.  *See* Turner Decl. at ¶ 9.  Moreover, PillPack, through Fluent, has failed to produce meta data to establish otherwise despite Fluent's claims that "[its] technology platforms and systems enable [them] to collect …. *Meta-data* – information gleaned by the system such as the user's IP address, browser type, operating system, and, for mobile

connected devices, the device model, device ID and mobile carrier." *See* Cogint, Inc. 10-K at p.

4, available at http://investors.fluentco.com/static-files/7dfdc04f-94ec-4f49-9b27-32a91b8c162f.

However, Fluent has only produced a suspect IP Address that according to its declarant originated

from either Nashville, Tennessee or Paduach, Kentucky. *See* Dkt. No. 34-4 at Exhibit 3. As

discussed above, Fluent claims it obtained same IP address from two different website visits,

despite Plaintiff allegedly providing two different addressees.  It is common knowledge that IP

Addresses are fluid and change based on device and location, thus, it is highly unlikely Fluent

would have captured the same IP address (and unreasonable that it would have relied on that to

determine alleged repeat visitors).  Moreover, Fluent has admitted in public statements to

previously possessing demographic information no "every American adult" (*see* Gallucci Decl. at

¶ 14), thus it's plausible that it possessed information about Ms. Turner separate and before any

alleged interaction.  Thus, due to this factual dispute, PillPack's motion should be denied.

   **2.  Plaintiff Never Agreed to an Arbitration Clause and Even if She Did (She Did Not)
        The Arbitration Clause Is With RewardZone Not PillPack.**

   According to PillPack, Ms. Turner visited the RewardZone USA website,

www.consumersrvycnter.com, on June 6, 2016, and the site, which appeared as a form or pop up

ad, prompted Ms. Turner to fill in certain demographic information in order to win a Michael Kors

Designer Bag valued at $500.[8]  Dkt. No. 34-4 at ¶ 6; *but see* Dkt. No. 34-4 at ¶ 7 (Mr. Bhadania

previously declared the HTML looked differently in his December 17, 2018 declaration.)  Ms.

Turner allegedly provided the requested information then pressed a button labeled "Continue"

which was in large font and encompassed by an even larger grey toned rectangle.  The form or pop

up ad, contained no web address, and only included the name National Consumer Center when a

---

[8] Ms. Turner denies ever entering into any promotion or sweepstake to win a Michael Kors bag.
*See* Turner Decl. at ¶ 9.  Thus, Ms. Turner denies ever entering into any arbitration whatsoever
with Fluent LLC, RewardZone USA, National Consumer Center or Pillpack.

user scrolled to the bottom of the screen, past the continue button. In tiny and presumably illegible font, above the bold continue button is a statement "I understand and agree to the <u>Terms & Conditions</u> which includes mandatory arbitration and <u>Privacy Policy</u>."  Dkt. No. 34-4 at ¶ 7.

The Terms & Conditions were presented via a hyperlink, which according to Fluent, LLC if clicked, the user was allegedly redirected to a page labeled REWARDZONEUSA, LLC WEBSITES – TERMS AND CONDITIONS.  Dkt. No. 34-5 at ¶ 5.  Notably, Fluent has not produced any evidence that Ms. Turner clicked this hyperlink or scrolled through any of its contents.  After "Last Modified December 16, 2015," the document states "We (RewardZone USA, LLC) operate RewardZoneUSA.com, NationalConsumerCenter.com and other websites (Websites) where you can qualify to earn incentives – merchandise or gift cards (Incentives) - by completing certain offers (Promotions)."  Dkt. No. 34-5 at Exhibit A. The arbitration provision to which PillPack relies then states, "If you have a dispute concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive, …. you *can* submit your dispute for resolution by arbitration before the American Arbitration Association." (emphasis added). *Id*.

Practically speaking, because there is no web address on the form Plaintiff was allegedly prompted to fill out in order to win the prize, it would be impossible for Plaintiff (or anyone) to know the name of the entity in which she would potentially have any dispute.  This is especially true as within the single HTML provided by Fluent nothing is branded Fluent or RewardZone USA. Dkt. No. 34-4 at ¶ 7. Next, if anything, assuming arguendo that Plaintiff was presented with the fillable form or pop up ad, and did in fact insert her information, she could only assume the entity to which she was waiving any rights to litigation would be National Consumer Center – the name presented on the form.  Further, even if she did click on the tiny print which provided the

16

hyperlink to the Terms and Conditions (she did not), she would only be presented with the additional entity RewardZone USA, LLC. Dkt. No. 34-5 at Exhibit A. The Terms and Conditions are clearly limited to that entity only.   The Terms and Conditions provide no further links or references to any other entities who would potentially attempt to enforce the arbitration agreement – it does not include Fluent, LLC and it does not include any "Marketing Partners".

Instructive on this issue is *McKee v. Audible, Inc*. where the defendants filed a motion to compel arbitration asserting as one argument that the plaintiff agreed to arbitrate his claims against Audible when he registered his Amazon Echo device, through Amazon's Alexa App. *McKee v. Audible, Inc.,* No. CV 17-1941-GW(EX), 2017 WL 4685039, at *10 (C.D. Cal. July 17, 2017). The court was not persuaded by the defendants' argument and had concerns regarding the "laundry list of user agreement hyperlinked as part of Alexa's terms of use" which added a "level of procedural unconscionability." *Id*. at *10.   The court was also troubled by the fact that the plaintiff was seeking to activate his Amazon Echo, when he, according to the defendant in the case, agreed to an arbitration agreement to be enforced by Audible.  *Id*. at *11.   Specifically, the court found:

> It is simply hard for the Court to imagine that a reasonable consumer registering the Amazon Echo expects to be presented with terms of use governing his or her contractual relationship with separate corporate entities, let alone one he or she has never dealt with. As a result, though the Alexa Sign in page may afford notice of Alexa's Terms, it does not necessarily afford notice of Audible's COU. Indeed, the Court would hold that Alexa's sign in page does not afford a reasonable consumer notice, constructive or otherwise, that by "setting up" Alexa, he or she was agreeing to arbitrate claims against Audible. No amount of hyperlinking, cross promotion, or pro-arbitration jurisprudence changes the reality of internet commerce: a consumer agreeing to terms of use for his or her Echo cannot be reasonably expected to know they are giving up the right to sue Audible.

*McKee*, 2017 WL 4685039, at *11.

Similar here, assuming arguendo that Ms. Turner did click the continue button on the RewardZone USA form, Ms. Turner had absolutely no notice that she would be potentially waiving her rights to litigation against the hundreds or thousands of entities which were presented

on the "Marketing Partner" list a year after she allegedly pressed a continue button on a wholly different website. Instead, at the time the first continue button was allegedly pressed, the only companies which Ms. Turner could have reasonably been provided with notice that she may need to arbitrate her claims would claims against National Consumer Center and/or RewardZone, LLC. It would be impossible and unreasonable for Ms. Turner to assume otherwise.

The arbitration terms at issue here are further unenforceable because the promise to arbitrate is illusory. As explained by the Illinois Court of Appeals, "an illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything. An illusory promise is also defined as one in which the performance is optional. Either way, it is not sufficient consideration to support a contract." *W.E. Erickson Const., Inc. v. Chicago Title Ins. Co.*, 641 N.E.2d 861, 864 (Ill. App. 1st Dist. 1994) (citations omitted). "The Supreme Court has never held that the FAA preempts state law rules requiring that arbitration provisions themselves contain consideration (i.e., that they not be illusory), and it would require a substantial extension of existing precedent to do so here." *Noohi v. Toll Bros., Inc.,* 708 F.3d 599, 612 (4th Cir. 2013).

At the time Ms. Turner allegedly clicked the "continue" button and, in Pillpack's view, she agreed to RewardZone, LLC's arbitration clause, RewardZone, LLC provided no consideration for Ms. Turner's alleged promise to arbitrate any disputes. Furthermore, Ms. Turner was never awarded any Michael Kors bag or received anything whatsoever from the purported contract. (Turner Declaration, ¶¶10-11).

### C.  PillPack's Reliance on Caselaw is Misguided.

PillPack's motion to compel provides in string cite form various cases which arguably state that online clickwrap agreements in the Sixth Circuit can be enforced. However, PillPack misses the point. Plaintiff does not disagree that clickwrap agreements can be enforceable in certain

instances.   However, the clickwrap agreement must be enforced by the entity to whom the clickwrap agreement belongs – in this case RewardZone USA, LLC.  In fact, the first case cited by PillPack, *Tres Jeanee, Inc. v. Brolin Retail Sys. Midwest, Inc.*, the plaintiff filed suit against two defendants.  The case referenced an initial motion filed by both defendants to compel arbitration of all claims pursuant to an agreement entered into by Brolin and the plaintiff and the court held that only Brolin, not Micros could compel the plaintiff to arbitrate its claims.  *Tres Jeanee, Inc. v. Brolin Retail Sys. Midwest, Inc*., No. CIV. A. 3:07-CV-139H, 2007 WL 3118482, at *1 (W.D. Ky. Oct. 22, 2007).   Furthermore, the court ultimately denied Brolin's second request to arbitrate claims when defendant Brolin presented a clickwrap contract between the plaintiff and itself, finding the agreement was outside the scope of the contract.  *Id*. at *3.

Defendant's reliance on *Seim v. HomeAway, Inc.* is similarly misplaced as again, the defendant HomeAway moved to compel arbitration, asserting that the plaintiff was bound by <u>its own</u> arbitration agreement.  *Seim v. HomeAway, Inc.,* No. 1:16-CV-479-LY, 2017 WL 3478488, at *1 (W.D. Tex. Jan. 18, 2017).  The same is true in *Arnold v. Homeaway, Inc.,* 890 F.3d 546, 549 (5th Cir. 2018) (plaintiff had an agreement with defendant Homeaway) and *Carey v. Uber Techs., Inc*., No. 1:16-CV-1058, 2017 WL 1133936, at *2 (N.D. Ohio Mar. 27, 2017) (plaintiff had an agreement with defendant Uber).

Defendant also relies on *Gray v. Midland Funding, LLC* for the proposition that clicking a box labeled "Yes! I accept these terms" creates an agreement to arbitrate where the terms included an arbitration provision.  However, *Gray* supports Plaintiff's position.  In *Gray*, the plaintiff incurred credit card debt which, for one reason or another, she did not pay. Gray's original creditor, sold her debt, and after a series of transactions, Midland obtained it.  Midland sought to invoke the arbitration provisions contained in the original credit agreements, however the plaintiff swore that

she did not open and agree to the terms.  Regarding the factual discrepancies, the court found as follows:

> Contrary to Midland's contentions, it is far from undisputed that "Gray is subject to and agreed to all of the terms of [all of] the Credit Agreements, including the arbitration provisions." [DN 17 at 9.] With regard to the first Agreement, the MetaBank Credit Agreement, Gray swears in her affidavit that she did not open her Account online and in fact that she has never visited the Fingerhut website. [DN 20-1 at 2.] A logical inference from this is that Gray did not "explicitly agree[ ]" to the MetaBank Credit Agreement by assenting to a clickwrap agreement on the Fingerhut website, as Midland avers. [DN 23 at 6–7 (citing DN 23-1 at 3–4).] Accordingly, Gray's unequivocal denial that she opened her Account online makes this fact genuinely disputed.

*Gray v. Midland Funding, LLC*, No. 5:16-CV-00036-TBR, 2017 WL 1293995, at *4 (W.D. Ky. Apr. 4, 2017).  In that case, instead of granting the defendant's motion to compel, the court ordered an evidentiary hearing prior to making a determination as to whether the plaintiff asserted to the terms of the credit agreements.  *Gray*, 2017 WL 1293995, at *6. Here, similar to Gray, Ms. Turner alleges that she never filled out the form to win a designer Michael Kors bag and in fact she never received a Michael Kors designer bag.  Turner Decl, at ¶ 11. *See also Berman*, 2018 WL 2865561, at *4 ("In this case, factual disputes exist as to whether Berman or an individual acting on his behalf consented to the terms and conditions at issue. Although Defendants state that the individual who registered Berman's phone number on the APC website agreed to be bound by the terms and conditions, Berman denies having visited the website or having authorized anyone to do so on his behalf.")

### D. Plaintiff's TCPA Claim is Outside the Scope of RewardZone USA's Terms and Conditions.

"[I]t is the language of the contract that defines the scope of disputes subject to arbitration." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002).  Thus, as a threshold matter, a court must still determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, as "nothing . . . prevents a party from excluding statutory claims from the scope

of an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 622 n.9, 628 (1985).  Any ambiguities must be construed against the party that drafted the contract's language. *See L.K. Comstock & Co., Inc. v. Becon Construction Co.,* 932 F. Supp. 948, 968 (E.D. Ken. 1994) (relying on the general principle recognized by Kentucky law "that a contract must be construed more strongly against the party which drafted the document"). Thus, assuming arguendo, if the Court finds that Plaintiff agreed to an arbitration clause with RewardZone USA, her claim is not within the scope of RewardZone USA's arbitration clause.

 Here, the underlying conduct for the alleged TCPA violations, i.e., PillPack's text messages sent to Ms. Turner's cell phone, do not relate to or implicate her purported relationship with RewardZone, LLC or the reward websites it runs.  The verbiage of the arbitration clause states: "If you have a dispute concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive…you can submit your dispute for resolution by arbitration."  Dkt. No. 34-3 at Exhibit A.  Ms. Turner, however does not have a dispute about the Website (which was apparently www.consumersrvycnter.com though no website was shown on the form) and this case is not requesting recourse for any promotion she may have entered to which she received nothing. Besides the fact that Ms. Turner disputes ever entering into any promotion to receive a Michael Kors bag, the text messages from PillPack have absolutely nothing to do with the RewardZone's promotion for a Michael Kors bag.  PillPack's attenuated argument stretches too far attempting to join an alleged agreement to arbitrate which was purportedly assented to in June 2016 to a text message from PillPack over a year later in October of 2017, which was based on a completely different form to win a Walgreens gift card which had no arbitration agreement included or referenced.  Dkt. No. 34-4, at 11.

Furthermore, RewardZone USA has since changed its Terms & Conditions to expressly

include "Marketing Partners" and "telemarketing or SMS/text messages." *See* https://contact.surveyandshop.com/policies/terms (last visited on March 1, 2019). Thus, if RewardZone USA intended to cover disputes beyond only "dispute[s] concerning any aspect of these Terms & Conditions, the Website, your participation in a Promotion, or entitlement to an Incentive" RewardZone USA could have expressly included such provisions, but it did not.

### E.  PillPack, an Unrelated Non-signatory, Cannot Enforce RewardZone's Agreement.

The doctrine of equitable estoppel is to be applied "flexibly by a federal court to achieve fairness and avoid injustice." *Jennings Water, Inc. v. North Vernon*, 895 F.2d 311, 316 (7th Cir. 1989). The doctrine rests on the principle that "it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006). Courts have recognized that the doctrine of equitable estoppel allows a nonsignatory to compel arbitration in two circumstances:

> First, equitable estoppel applies when the signatory "must rely on the terms of the written agreement in asserting its claim" against a non-signatory. Thus, "[w]hen each of a signatory's claim[s] against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims arise out of and relate directly to the written agreement and arbitration is appropriate." Second, equitable estoppel also applies "when the signatory raises allegations of ... substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."

*Hoffman v. Deloitte & Touche LLP*, 143 F.Supp.2d 995, 1004–05 (N.D. Ill. 2001) (alteration in original) (citations omitted) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999), abrogated on other grounds by *Arthur Andersen LLP*, 556 U.S. 624 (2009)).

Kentucky allows a non-signatory to enforce an arbitration agreement against a signatory under a theory of equitable estoppel "when the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Household Finance Corp. II v. King*, No. 2009-CA-001472-MR, 2010 WL 3928070, *4 (Ky. App. October 8, 2010).  Here, PillPack claims that its violation of the TCPA "necessarily alleges

interdependent and concerted misconduct by PillPack, Fluent, and Reward Zone." Mot. at 18. However, RewardZone USA, LLC is the only party to the purported Terms & Conditions and Plaintiff has no allegations in her original Complaint (Dkt. No. 1) or proposed First Amended Complaint (Dkt. No. 28-1) claiming that RewardZone USA, LLC violated the TCPA, nor do they mention RewardZone USA and PillPack does not have any agreement with RewardZone USA.

Although Plaintiff may doubt the legitimacy of RewardZone's business model and dealings, and although Plaintiff intends to argue that PillPack will be liable for text messages sent on its behalf by Fluent and its texting vendor, Plaintiff's TCPA claims are not related to RewardZone, LLC, the completely unrelated data mining company who obtained Plaintiff's demographic information (or previously had Plaintiff's demographic information in its database) and sold it to Fluent, LLC and/or PillPack. The TCPA action is simple and straightforward - text messages by PillPack and Fluent.

Analogous here is *White v. Sunoco, Inc.,* 870 F.3d 257, 265 (3d Cir. 2017). In that matter, a putative class of plaintiffs sued Sunoco, alleging fraud and misrepresentations induced them to get a Sunoco Rewards Card from Citibank. The plaintiffs alleged they were promised rewards like a five cent/gallon discount on gas purchases, but they did not receive the rewards. Sunoco moved to compel arbitration based on the credit card agreement between the plaintiffs and Citibank. The district court denied the motion and the Third Circuit affirmed. Critically, the court found that neither of the situations were present that support applying equitable estoppel: concerted conduct between the Sunoco and Citibank; or plaintiff's reliance on the credit card agreement. *White v. Sunoco, Inc.,* 870 F.3d 257, 265 (3d Cir. 2017); *see also Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("Rajagopalan has "statutory claims that are separate from the [ ] contract itself.'")

Simply, Plaintiff's claims against PillPack do not rely on any terms from the RewardZone USA Terms and Conditions.  Thus, Plaintiff cannot be forced to arbitrate her claims. No terms in the RewardZone USA Terms and Conditions have any bearing on the validly of Plaintiff's claims against PillPack regarding statutory-based TCPA violations.

### F. PillPack Cannot Compel Arbitration as Third-Party Beneficiary.

Under Kentucky law, third parties to a contract may enforce the terms of the contract by showing the parties to the contract intended by their agreement to benefit the third parties directly. *See Sexton v. Taylor County*, 692 S.W.2d 808 (Ky. Ct. App. 1985). Such intent need not be expressed in the agreement itself, as it may also be evidenced by the surrounding circumstances. *Id*. An actual and direct promise for the benefit of a third party will be sufficient to create privity between the promisor and the third-party beneficiary. *See Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc*., 420 F.Supp.2d 764, 770 (W.D. Ky. 2005). An incidental beneficiary does not acquire such a right. *See Presnell Constr. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004); *Louisville Gas & Elec. Co*., 420 F.Supp.2d at 770 (defining incidental beneficiary as beneficiary who is not intended beneficiary).  Third parties will often benefit from performance of service contracts, but those third parties do not typically rise to the level of intended beneficiaries. *See Louisville Gas & Elec. Co.*, 420 F.Supp.2d at 771.

"The creation of a third party beneficiary contract requires that the parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract." *Burke & Thomas, Inc. v. Int'l Org. of Masters*, 600 P.2d 1282, 1285 (1979).  PillPack has submitted no evidence that Ms. Turner, an alleged signatory to the contract, intended to designate PillPack as a third-party beneficiary, that PillPack assumed any duties or obligation under the contract, or that any party assumed direct obligations to PillPack.  PillPack makes the

argument that it should be included in the argument provision as "any person related to us…" However, at the time Ms. Turner allegedly clicked the continue button and assented to Terms and Conditions, PillPack was not even a partner of RewardZone. Thus, Plaintiff could not have possibly intended that "any person related to us" would be PillPack – who was not related in any manner to RewardZone at that time. Further, it would be impossible for Ms. Turner to assume that that "us", for the purposes of arbitration, would mean any entity that RewardZone had or will have in the future an affiliation with. The law simply requires more. As Defendant agrees, a third-party beneficiary of a contract is one who "was intended by the parties to benefit from the contract." How could Ms. Turner possibly have intended PillPack to benefit from an arbitration clause at the time the contact was assented too if PillPack was not even affiliated with RewardZone at the time.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend his complaint must be granted.

Dated:  March 1, 2019                    */s/ Kas L. Gallucci*

**LAW OFFICES OF RONALD A. MARRON**
ALEXIS M. WOOD (CA Bar 270200) (*Pro Hac Vice*)
KAS L. GALLUCCI (CA Bar No. 288709) (*Pro Hac Vice*)
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

***Attorneys for Plaintiff and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of March, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

Dated:  March 1, 2019          **LAW OFFICES OF RONALD A. MARRON**

By*: /s/ Kas L. Gallucci*

Kas L. Gallucci

*Attorney for Plaintiff and the Proposed Class*

26